UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

OLIN CORPORATION,

                              Plaintiff,

      v.                                                **DECISION AND ORDER**

E.I. DUPONT DE NEMOURS AND COMPANY,              05-CV-100S(Sc)
and NATIONWIDE BOILER, INC.

                              Defendants.

## I. INTRODUCTION

Plaintiff Olin Corporation ("Olin") commenced this action on February 14, 2005 and filed an Amended Complaint on March 24, 2005, asserting contract and negligence claims against Defendant E.I. DuPont Nemours and Company ("DuPont") and a breach of contract claim against Defendant Nationwide Boiler, Inc. ("Nationwide").

Presently before this Court is Defendant DuPont's Motion to Dismiss the Amended Complaint and to Compel Arbitration "pursuant to the Federal Rules of Civil Procedure 12(b) and the Federal Arbitration Act." (Docket No. 7). For the reasons stated below, DuPont's Motion is granted.

## II. STANDARDS OF REVIEW

### A.    Motion to Dismiss

Although DuPont purports to bring its motion pursuant to FED. R. CIV. P. 12(b), it declines to state the subpart it relies on or otherwise identify the basis for the relief requested. This Court presumes DuPont seeks to challenge the Amended Complaint under Rule 12(b)(1) (lack of subject matter jurisdiction) and/or Rule 12(b)(6) (failure to state

a claim).

When reviewing a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997); Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999). A complaint should be dismissed "'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" Swierkiewicz v. Sorema N.A., 346 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984)).

However, where, as here, a plaintiff references written documents in the complaint, the court may take the documents into consideration in ruling on a Rule 12(b)(6) motion even if they are not attached to the complaint and made a part thereof under Rule 10(c). Sazerac Co., Inc. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994) (citing Cortec Indus., Inc. v. Sum Holding L. P., 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992); I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991)). If the documents referenced in the complaint contradict the facts alleged by the plaintiff, the documents control and the court need not accept as true the plaintiff's allegations. *See* Feick v. Fleener, 653 F.2d 69, 75 & n.4 (2d Cir. 1981).

The scope of materials that may be considered is even more expansive when the court is asked to resolve a question of subject matter jurisdiction. Then, a court may consider any evidence that has been submitted, including affidavits, to determine whether subject matter jurisdiction exists. Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1019 (2d Cir. 1993) (citations omitted).

**B.    Motion to Compel Arbitration**

When a motion to compel arbitration is brought under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4,[1] the court applies a standard similar to that applicable to a motion for summary judgment. Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003). When such a motion is opposed on the ground that no agreement to arbitrate has been made between the parties, a district court should give the opposing party the benefit of all reasonable doubts and inferences that may arise. Doctor's Associates, Inc., v. Distajo, 944 F. Supp. 1010, 1014 (D. Conn. 1996), *aff'd*, 107 F.3d 126 (2d Cir. 1997), *cert. denied*, 522 U.S. 948, 118 S. Ct. 365, 139 L. Ed. 2d 284 (1997).

Having reviewed the documents referenced in the Amended Complaint, the parties' affidavits, and the additional documents attached thereto, this Court finds that all are potentially subject to review in connection with DuPont's motion to dismiss and to compel arbitration.

### III.  DISCUSSION

**A.    Facts**

During the time period at issue, Olin operated a chemical manufacturing facility on property owned by DuPont. (Am. Compl., ¶¶ 6-9; Affidavit of James K. Leader, sworn to Apr. 6, 2005 (the "Leader Aff."), ¶ 4). The parties entered into a Services Agreement, dated February 7, 1997 (the "Services Agreement"), pursuant to which DuPont supplied various services to Olin's manufacturing operation for a fee. (Am. Compl., ¶ 10; Leader

---

[1] DuPont has not assisted the Court by invoking a particular provision of the FAA. Rather, it claims to be moving under every provision of the Act, *i.e.*, 9 U.S.C. §§ 1-16. This Court declines to review each of the Act's provisions and will focus on the section corresponding to the title of Defendant's motion.

Aff., ¶ 4, Ex. B; Affidavit of Hassan Arabghani, sworn to May 17, 2005 (the "Arabghani Aff."), ¶ 6) One of items supplied under the Services Agreement was Steam Service. (Am. Compl., ¶ 11; Leader Aff., ¶ 4; Arabghani Aff., ¶ 7).

In April 2002, DuPont gave Olin notice of its intent to terminate some of the services it provided under the Services Agreement, including Steam Service, and subsequently identified June 5, 2002 as the service termination date. (Arabghani Aff., ¶¶ 9, 10, 12, 13, Exs. A-C).

The parties met on May 2, 2002, at which time DuPont proposed terms for a new agreement covering the provision of Steam. (*Id.*, ¶ 11). On July 1, 2002, the parties executed a "Term Sheet" which set forth the terms for DuPont's continued provision to Olin of Steam, among other things. (Leader Aff., Ex. B; Arabghani Aff., ¶ 14, Ex. C). The Term Sheet specified May 31, 2002 as the expiration date for billing under the Services Agreement, and June 1, 2002 as the commencement date for the provision of Steam under the Term Sheet. (Leader Aff., Ex. B, § 1.(a)). From June 1, 2002 through at least August 31, 2003, DuPont continued to provide Steam to Olin and to bill Olin under the terms of the new agreement.[2] (Am. Compl., ¶¶ 12-13; Leader Aff., Ex. C; Arabghani Aff., ¶¶ 8, 16).

Olin's claims in this action relate to DuPont's purported failure to supply reliable, uninterrupted steam in sufficient quantity and at a sufficient pressure to meet Olin's needs, pursuant to its duties under the new agreement. (Am. Compl., ¶¶ 13, 20, 26, 31, 35).

---

[2] Both the Amended Complaint and the Arabghani Affidavit refer to a "new agreement" covering the period beginning June 1, 2002. There is no indication that the "new agreement" is anything other than the "Term Sheet."

Specifically, Olin alleges that there were sixty-six Steam interruptions between June 2002 and March 2003 which impacted the quality and operability of its manufacturing process. (Am. Compl., ¶¶ 14-16).

**B.    Analysis**

DuPont argues that Olin's claims against it must proceed to arbitration because the dispute arises from the Services Agreement, which includes an arbitration provision. Alternatively, even if the Term Sheet governs, the parties expressly agreed to arbitrate disputes relating to its terms.[3]

In response to DuPont's motion, Olin urges that the Services Agreement was terminated prior to the events giving rise to this action and vehemently denies that the parties intended to be bound by the Term Sheet. According to Olin, the Term Sheet represents nothing more than the parties proposals, which would become binding only to the extent that they were included in a subsequently negotiated Settlement Agreement. There is no dispute that the parties did not enter into the anticipated Settlement Agreement.

Pursuant to the FAA, arbitration agreements in any contract involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The 'liberal federal policy favoring arbitration agreements,' manifested by this provision and the Act as a whole, is at bottom a policy guaranteeing the enforcement of private contractual arrangements." Mitsubishi

---

[3] In support of its motion, DuPont filed the a Memorandum of Law, the Affidavit of James K. Leader, Esq., with exhibits, and the Reply Affidavit of James K. Leader with exhibits. Olin filed an opposing Memorandum of Law and the Affidavit of Hassan Arabghani, with exhibits.

Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)).

The FAA also provides that "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which would, save for the agreement, have jurisdiction . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The Supreme Court has confirmed the mandatory language of the FAA:

> By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that the district court shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.

Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985).

Nevertheless, before a party can be required to submit to arbitration, it is entitled to a judicial determination of the threshold question of whether it ever entered into an agreement which obligates it to the arbitration course. PMC, Inc. v. Atomergic Chemetals Corp., 844 F. Supp. 177, 181 (S.D.N.Y. 1994), *aff'd*, 122 F.3d 1057 (2d Cir. 1995). If an agreement to arbitrate is found to exist, a district court must then determine whether the dispute at issue falls within the scope of that agreement. Cap Gemini Ernst & Young, U.S., LLC v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003).

**1.     Did the Parties Enter into a Valid Agreement to Arbitrate?**

**(a).     The 1997 Services Agreement**

DuPont contends that "[t]he Services Agreement is the foundation of all of Olin's claims." (DuPont MOL, p. 8). DuPont states this as a given, without providing any factual or legal analysis in support of its conclusion that the Services Agreement governs this dispute. Moreover, DuPont fails to address in any meaningful way the elephant in the room—*i.e.*, its two letters notifying Olin that it was terminating the Steam Services portion of the Services Agreement, its subsequent letter stating that the provision of Steam after June 5, 2002 would be treated as outside of the Services Agreement, and its confirmation in the Term Sheet that "the Services Agreement for steam . . . shall expire on . . . May 31, 2002." (Arabghani Aff., Exs. A-C and D, § 1.(a)).

This dispute involves alleged disruptions in the provision of Steam from June 2002 through March 2003. DuPont gave repeated notifications and representations that it was terminating Steam Services under the Services Agreement on or before June 5, 2002, and stated its intent that the provision of Steam thereafter would be outside the Services Agreement. The Service Agreement's arbitration clause, though broad, is limited to "any dispute or claim arising under this Agreement." (Leader Aff., Ex. B, Art. 14). DuPont has provided no basis for this Court to conclude that, in entering into the Services Agreement, the parties intended to arbitrate disputes arising after the expiration of, and outside of, that Agreement.[4]

---

[4] DuPont provides no authority for the proposition that an arbitration clause such as appears in the Services Agreement can encompass conduct occurring after the contract's termination. That is not to say that no such authority exists. However, this Court declines to consider the question absent any indication that DuPont was inclined to research and brief its position.

Accordingly, this Court finds that the Services Agreement, standing alone, is not a valid agreement to arbitrate the dispute at issue here.

### (b). The Term Sheet

DuPont contends, without briefing the issue or engaging in any contract analysis, that "[s]hould Olin assert that a July 2002 Term Sheet came to govern the provision of steam, the same contractual provisions govern and the same result is required." (Leader Aff., ¶ 6).

It is Olin's position that Steam Services under the Services Agreement were terminated, the Term Sheet is simply a recitation of various proposals that never culminated in an agreement, and, therefore, there is no agreement to arbitrate this dispute. (Arabghani Aff., ¶¶ 9-16).

The relevant provisions of the Term Sheet state as follows:

Term Sheet

> During conference calls on June 19, 20, 21 and 24, 2002, representatives of Olin and DuPont discussed a proposal to resolve all existing claims between the Parties relating to the Services Agreement for the Niagara site . . . . These proposals were made without prejudice and without waiving any rights the Parties may have under the agreements. **The proposals will only become binding when the Parties execute a final Settlement Agreement, acceptable in form and substance to both parties; however, the parties intend to be bound by and act consistently with the Term Sheet until such time as the final Settlement Agreement is reached and executed. This Term Sheet and any settlement negotiations preceding or related to this Term Sheet will not be admissible as evidence or otherwise in any arbitration proceeding.**
>
> 1. <u>Steam/Package Boilers</u>.
>    (a)  **The intent of this provision is for DuPont to provide steam to both parties from a package boiler system during an Interim Period . . . . Final billing under the Services Agreement**

> **for steam shall be made through May 31, 2002, and same shall expire on same date, May 31, 2002 . . . . The Interim Period will commence on June 1, 2002** and continue [sic] such time as Olin has terminated its rights to obtain DuPont steam under the Settlement Agreement.  [I]n no event will the Interim Period extend beyond July 31, 2003.
>
> 6. <u>Excused Performance</u>
>    (a) . . . . Such . . . obligations . . . shall not survive expiration of the five year term of the Settlement Agreement.
>
> 7. <u>Service Standard: Liability Provisions</u>.
>    **The Parties agree that . . . they will incorporate into the Settlement Agreement . . . the dispute resolution sections set forth in the Service Agreement.**
>
> 8. **<u>Binding Nature of Term Sheet</u>.**
>    **The Parties will not take any action inconsistent with the Term Sheet and will continue to negotiate in good faith towards a Settlement Agreement.** Each Party will give the other five (5) days notice if it believes a Settlement Agreement cannot be reached. **If disputes arise, dispute resolution mechanism under the Services Agreement shall be followed.**

(Leader Aff., Ex. C) (emphasis supplied).

To defeat DuPont's motion relative to the Term Sheet, Olin must provide an unequivocal denial that an agreement was made, and some evidence to substantiate the denial. <u>Interocean Shipping Co. v. National Shipping & Trading Corp.</u>, 462 F.2d 673, 676 (2d Cir. 1972), *cert. denied*, 423 U.S. 1054, 96 S. Ct. 785, 46 L. Ed. 2d 643 (1976). For the reasons stated below, this Court finds that neither of these requirements has been met.

In his Affidavit, Hassan Arabghani denies "that the particular issues in dispute in this lawsuit belong in arbitration" and attests to Olin's position that the Term Sheet merely

documents proposals, not an agreement (¶¶ 4, 14). However, in the same Affidavit, Mr. Arabghani affirms the parties' intent to "be bound by and act consistently with the Term Sheet until such time as they [sic] final Settlement Agreement is reached and executed." (¶ 14). In addition, both the Amended Complaint and Mr. Arabghani make repeated references to a "new agreement" under which the parties operated after May 31, 2002. (Am. Compl., ¶¶ 12-13, 21; Arabghani Aff., ¶ 8, 17-18). While Olin conclusorily argues that the Term Sheet was not the parties' "operative agreement" (Olin MOL, p. 7), it has not come forward with evidence indicating that the provision of Steam by DuPont and the instant breach of contract dispute are based on any "operative agreement" other than the Term Sheet.

Olin's simultaneous protest that the Term Sheet is not an agreement and its reliance on a "new agreement" covering the period commencing June 1, 2002 (the effective date of the Term Sheet) as the basis for this action, does not make for an unequivocal denial of the existence of an agreement. However, this does not end the inquiry. Because the parties offer differing interpretations as to the Term Sheet's binding or non-binding nature, this Court is obliged to determine whether there is a reasonable basis for a difference of opinion as to the meaning and intent of the Term Sheet in that regard.

When determining whether a contract to arbitrate has been established for the purposes of the FAA, federal courts should apply "ordinary state-law principles that govern the formation of contracts" to decide "whether the parties agreed to arbitrate a certain matter." First Options, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995); see also, Thomson-CSF S.A. v. American Arbitration Ass'n., 64 F.3d 773, 776-77 (2d Cir. 1995); Genesco, Inc. v. T. Kakiuchi & co., 815 F.2d 840, 844 (2d Cir. 1987);

Brennan v. Bally Total Fitness, 198 F. Supp. 2d 377, 381 (S.D.N.Y. 2002). Where the language of an agreement is unambiguous, "the parties' intent is determined within the four corners of the contract, without reference to external evidence." Feifer v. Prudential Ins. Co. of Am., 306 F.3d 1202, 1210 (2d Cir. 2002) (citation omitted). Under New York law[5], an agreement must be read "as a whole, and every part will be interpreted in reference to the whole." Westmoreland Coal Co. v. Entech, Inc., 100 N.Y.2d 352, 794 N.E.2d 667, 763 N.Y.S.2d 525 (2003) (quotations and citations omitted).[6]

Olin relies on a portion of a sentence in the Term Sheet's preamble stating that the proposals will only become binding when the parties execute a final Settlement Agreement and also on section 7, memorializing the parties' agreement to include the dispute resolution provisions of the Services Agreement into the yet to be negotiated Settlement Agreement. This, of course, ignores the second portion of the preamble sentence which states the parties' intent to be bound by the Term sheet. It also ignores section 8, an operative provision of the agreement appearing immediately above the parties' signatures and entitled Binding Nature of Term Sheet.

A contract should be read in a manner that gives effect to all terms and expressions. Browning-Ferris Industries of New York, Inc. v. County of Monroe, 103 A.D.2d 1040, 1040 (4th Dep't 1984), *aff'd*, 64 N.Y.2d 1046 (1985). The question, then, is whether, viewing the Term Sheet as a whole, it is possible to give effect to the preamble sentence in its entirety.

---

[5] The Term Sheet does not contain a choice of law provision. The law of the forum state governs where, as here, there is no allegation that the law of a different state is controlling. Pfizer, Inc. v. Stryker Corp., 348 F. Supp. 2d 131, 142 n. 63 (S.D.N.Y. 2004) (citation omitted).

[6] Neither party has engaged in contract interpretation to reconcile the purported inconsistencies in the Term Sheet, preferring to parse the language in support of their respective arguments.

Pursuant to the Term Sheet, the Interim Period during which a Settlement Agreement would be negotiated was not to extend beyond July 31, 2003. (Leader Aff., Ex. C, § 1,(a)). If and when a Settlement Agreement was reached, its anticipated term would be five years. *Id*., § 6. Considering the Term Sheet as a whole, the preamble sentence can be read in a way that gives effect to all of its terms as follows. The parties intended to be bound by the proposals set forth in the Term Sheet until the earlier of July 31, 2003 or the execution of a Final Agreement. Thereafter, the proposals in the Term Sheet would become binding to the extent they were incorporated into a Final Agreement acceptable in form and substance to both parties. In short, this Court finds that it is possible to read the preamble sentence at issue in a way that gives all of its terms effect and is consistent with the remaining provisions of the Term Sheet.

Even were that not the case, "it is a fundamental rule of contract construction that specific terms and exact terms are given greater weight than general language." Aramony v. United Way of Am., 254 F.3d 403, 413-14 (2d Cir. 2001) (quotation marks and citations omitted). An introductory provision such as a whereas clause, or in this case the preamble, while sometimes useful as an aid to interpretation, "'cannot create any right beyond those arising from the operative terms of the document.'" Abraham Zion Corp. v. Lebow, 761 F.2d 93, 103 (2d Cir. 1985) (quoting Genovese Drug Stores, Inc. v. Connecticut Packing Co., 732 F.2d 286, 291 (2d Cir. 1984)). Applying this well-settled principle, the operative provisions of the Term Sheet unambiguously confirm the parties' intent to act consistently with the Term Sheet—*i.e.*, to be bound by it—and to use the dispute resolution mechanism under the Services Agreement if a dispute arises. (Leader Aff., Ex. C, § 8).

Finally, this Court rejects Olin's suggestion that the parties' expressed intent to

incorporate the Services Agreement's dispute resolution provisions into a final Settlement Agreement indicates there was no intent to incorporate them into the Term Sheet. Rather, that language evidences consistency when the Term Sheet is read as a whole and in the context of the parties' relationship. The parties agreed to resolve disputes through arbitration under the Services Agreement, and intended to use the same dispute resolution process after a final Settlement Agreement was reached and also in the Interim Period between the two, while a final Agreement was being negotiated.

It was during this Interim Period that the events giving rise to Olin's claims purportedly took place and the dispute is arbitrable, assuming it falls within the scope of the arbitration provisions incorporated into the Term Sheet.

**2.   Does the Dispute Relating to Steam Services Fall Within the Scope of the Agreement?**

Under the dispute resolution provisions of the Services Agreement, which the parties incorporated into the Term Sheet, arbitration is the last step in a multi-step alternative dispute resolution process covering "any claim or dispute arising under this Agreement." (Leader Aff., Ex. B, Art. 14). The Second Circuit has recognized that a broad arbitration clause, such as this one, gives rise to a presumption of arbitrability. Oldroyd v. Elmira Savings Bank, 134 F.3d 72, 76 (2d Cir. 1998). The presumption of arbitrability that attaches to Olin's claims can be overcome only "if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that [it] covers the asserted dispute." Sinnett v. Friendly Ice Cream Corp., 319 F. Supp. 2d 439, 444 (S.D.N.Y. 2004) (quotation and citation omitted).

Here, the parties agreed to submit any claim or dispute under the Term Sheet to

arbitration. The Term Sheet expressly addresses the provision of Steam, the matter in dispute, and Olin has not come forward with an argument to the contrary.

Therefore, this Court finds that the Term Sheet contains a valid and binding agreement to arbitrate, and all of Olin's claims against DuPont in this action fall within the scope of the arbitration agreement. Having made this finding, an order directing the parties to engage in arbitration in accordance with their agreement is mandated. 9 U.S.C. § 4. Furthermore, because this Court has no jurisdiction to adjudicate any of Olin's claims against DuPont, the claims against this Defendant are properly dismissed.

### IV.  CONCLUSION

For the reasons stated, Defendant DuPont's Motion to Dismiss the Amended Complaint and to Compel Arbitration is granted.

### ORDERS

IT HEREBY IS ORDERED, that Defendant DuPont's Motion to Dismiss the Amended Complaint and to Compel Arbitration (Docket No. 7) is GRANTED.

SO ORDERED.

Dated:   March 26, 2006
         Buffalo, New York


                                           /s/William M. Skretny
                                           WILLIAM M. SKRETNY
                                           United States District Judge