UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

OLIN CORPORATION,

                Plaintiff,

v.                                       **DECISION AND ORDER**

E.I. DUPONT DE NEMOURS AND COMPANY,            05-CV-100S(Sc)
and NATIONWIDE BOILER, INC.

                Defendants.

## I. INTRODUCTION

Plaintiff Olin Corporation ("Olin") commenced this action on February 14, 2005, and filed an Amended Complaint on March 24, 2005, asserting contract and negligence claims against Defendant E.I. DuPont Nemours and Company ("DuPont") and a breach of contract claim against Defendant Nationwide Boiler, Inc. ("Nationwide"). On April 8, 2005, DuPont moved to dismiss the Amended Complaint against it and to compel arbitration, which motion was granted in its entirety on March 27, 2006. Thus, only Olin's breach of contract claim against Nationwide remains.

Presently before this Court is Nationwide's Motion for Summary Judgment dismissing the Amended Complaint against it. (Docket No. 39.)[1] For the reasons stated below, Nationwide's Motion for Summary Judgment is granted.

---

[1] In support of its Motion, Nationwide submitted a Local Rule 56.1 Statement of Undisputed Facts (Docket No. 40), the Declaration of Michael Medina, with exhibits (Docket No. 41), a Memorandum of Law (Docket No. 42), the Declaration of Karen McCay, with exhibits (Docket No. 55) and a Reply Memorandum of Law (Docket No. 56). Olin filed a Response to Olin's Local Rule 56.1 Statement (Docket No. 51), an opposing Memorandum of Law with exhibits A through J (Docket Nos. 52 and 53) and the Affidavit of Thomas F. Knab (Docket No. 60).

1

## II.  BACKGROUND

From 1984 to 1997, Olin and former-Defendant DuPont operated a facility for the production of caustic soda, chlorine, hydrogen, hydrochloric acid and certain by-products ("Chlor Alkali Facility") as a New York general partnership.  (Am. Compl. ¶¶ 7-9; Affidavit of Hassan Arabghani, sworn to May 17, 2005 ("Arabghani Aff."), ¶ 5.)  The Chlor Alkali Facility was located on land owned by DuPont in Niagara Falls, New York.  (Am. Compl. ¶¶ 6, 8.)  On February 7, 1997, DuPont conveyed its interest in the Chlor Alkali Facility to Olin.  (Arabghani Aff. ¶ 5.)

In conjunction with that conveyance, DuPont and Olin entered into an agreement dated February 7, 1997, pursuant to which DuPont sold to Olin certain services it needed for the continued operation of the Chlor Alkali Facility on DuPont's property.[2]  (*Id.* ¶ 6.)  One of the services DuPont agreed to provide was steam from its boiler house.  (*Id.* ¶ 7.)  At that time, the DuPont boiler house was providing steam to DuPont's own Terathane production operation and its Reactive Metals business ("RMS"), as well as to the Chlor Alkali Facility.  (Docket No. 52, Attach. 4 at 30:19-23.)  Terathane production consumed about 55 percent of DuPont's steam supply, RMS consumed approximately 10 percent, and Olin utilized the remaining 35 percent, with usage at the Chlor Alkali Facility accounting for approximately 30 percent of the total steam supply.  (*Id.* 30:19-23 and 31:5-12.)

In April 2002, DuPont announced that it would close its Terathane plant.  (Arabghani

---

[2] In its Amended Complaint, Olin alleges that its services agreement with DuPont terminated by mutual agreement on May 31, 2002, and was replaced by a new agreement pursuant to which Olin continued to purchase steam until August 31, 2003.  (Am. Compl. ¶¶ 12-13.)  This Court previously held that Olin's claims against DuPont relative to its provision of steam under the new agreement fell within the scope of an agreement to arbitrate, requiring their dismissal from this action.

Aff. ¶ 9.)  Because DuPont intended to demolish both its Terathane plant and its boiler house, it began looking into leasing a package boiler system to supply steam to the remaining operations at the Niagara Falls site.[3]  (Docket No. 52, Attach. 4 at 48:4-49:8.) DuPont prepared the specifications for the boiler system based on its assessment of usage at the site.  (*Id.* at 50:2-20.)  Pursuant to a rental agreement fully executed on April 25, 2002, DuPont leased from Nationwide two trailer-mounted boilers and two deaerating boiler feedwater systems.  (Declaration of Michael Medina, dated May 19, 2006 ("Medina Decl."), ¶ 18, Ex. K.)  In addition to the equipment, Nationwide was to provide to DuPont one set of operation manuals, one site visit for startup and operator training, and bimonthly site visits for maintenance and operation review.  (*Id*. Ex. K.)

Two alterations were made to the DuPont-Nationwide rental agreement within six months after its execution.  The first, dated April 29, 2002, just four days after the underlying agreement was fully executed, specified a shipping address for the leased equipment.  The second, dated September 9, 2002, increased the equipment rental rate for the remainder of the agreement's term to amortize the cost to DuPont of Nationwide's removing and replacing a fuel train and re-tuning a boiler.  (Docket No. 52, Ex. B, Ex. C at 55:13-57:1.)

### III.  DISCUSSION

In its Amended Complaint, Olin alleges that, pursuant to its services agreement with

---

[3] Once DuPont ceased its Terathane operations, assuming all other usage remained the same, the Chlor Alkali Facility would account for two-thirds of the Niagara Falls site's total steam requirements. Though Olin claims, "by process of deduction," that it would be a 90% user of steam after the Terathane shutdown, simple mathematics indicate otherwise.

3

DuPont, DuPont was obligated to provide reliable uninterrupted steam in sufficient quantity and at sufficient pressure so as not to delay or interfere with Olin's Chlor Alkali Facility. Olin further alleges that DuPont gave it an implied warranty of merchantability relative to the steam supplied as well as an implied warranty of the steam's fitness for Olin's purpose of operating its Chlor Alkali Facility. (Am. Compl., ¶¶ 13, 21, 25, 30.)

According to Olin, DuPont did not meet its obligation to provide uninterrupted steam sufficient for Olin's purpose. Specifically, there were 66 steam service interruptions over the 10-month period from June 2002 to March 2003 that impacted the quality and operability of the Chlor Alkali Facility. (*Id.*, ¶ 16.)

As for the DuPont-Nationwide rental agreement, Olin alleges that Nationwide's boiler system was defective and failed to operate properly, and that Nationwide failed to provide satisfactory contract services to DuPont relative to the operation and maintenance of the boilers. (*Id.*, ¶¶ 15, 17, 41, 42.) According to Olin, the DuPont-Nationwide rental agreement was made for Olin's sole and direct benefit for the purpose of providing the steam requirements at its Chlor Alkali Facility. (Am. Compl., ¶¶ 38-40.) In short, Olin urges that it is the third party beneficiary of that agreement and that its lost production directly resulted from Nationwide's alleged breach.

Nationwide seeks summary judgment on the ground that, as a matter of law, Olin is not an intended beneficiary of its rental agreement with DuPont. In their respective Local Rule 56.1 Statements, Nationwide and Olin agree that the DuPont-Nationwide rental agreement executed on April 25, 2002 does not mention Olin, does not specify the precise location for installation of the leased boilers, does not contain an express intent to benefit

4

a third party, and does not state that Olin is to be the sole and direct beneficiary of the rental agreement. (Docket Nos. 40, ¶¶ 3-6 and Ex. K; 51, ¶¶ 3-6.) It is also undisputed that Olin is not named in any proposal or other written communication between DuPont and Nationwide made prior to the execution of the rental agreement on April 25, 2002.[4] (Docket Nos. 40, ¶ 7 and Exs. A through J; 51, ¶ 7.) Finally, the parties agree that it was not until sometime after April 25, 2002 that Nationwide learned DuPont would be using the leased boilers to, among other things, supply steam to Olin's Chlor Alkali Facility.[5] (Medina Decl., ¶¶ 20-21; Docket Nos. 51, ¶ 4; 52, Ex. D at 55:5-57:2.) Olin urges that none of these undisputed facts defeat its third party beneficiary claim as a matter of law. The parties base their respective arguments on New York contract law.[6]

Under New York law, a third party is permitted to enforce a contract if that third party is its intended beneficiary. Flickinger v. Brown & Co., Inc., 947 F.2d 595, 600 (2d Cir.

---

[4] DuPont had requested various proposals from Nationwide commencing in or about April 2001. (Medina Decl. ¶¶ 6-15, Exs. A through J.)

[5] The parties disagree as to the precise date when Nationwide first learned of DuPont's intended uses for steam from the leased boilers, with Olin claiming DuPont disclosed the information when it provided Nationwide with delivery instructions on April 27, 2002, and Nationwide claiming that it did not learn of any connection with Olin until Nationwide's representative made a site visit after the leased equipment had been shipped.

[6] In diversity cases, this Court looks to New York choice of law rules to determine what law to apply to the parties' substantive claims. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); Hoelzer v. City of Stamford, 933 F.2d 1131, 1135-36 (2d Cir. 1991). In contract cases, New York courts "apply a 'center of gravity' or 'grouping of contacts' approach" under which "courts may consider a spectrum of significant contacts" to decide choice of law questions, "including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997) (citing In re Allstate Ins. Co. & Solarz, 81 N.Y.2d 219, 227 (1993)).

The parties here have not briefed the choice of law issue and apparently agree that New York law applies. Absent any briefing and in light of the parties' agreement, this Court will presume that New York law governs this breach of contract dispute.

1991). "An intended third party beneficiary to a contract means what it says—that the contract was intended for the benefit of a third party." Meagher v. Compania Mexicana de Aviacion, S.A. de C.V., 90 Civ. 7464, 1992 U.S. Dist. LEXIS 4757, at *18 (S.D.N.Y. Apr. 13, 1992) (citing In re Gulf Oil/Cities Service Tender Offer Lit., 725 F. Supp. 712, 733 (S.D.N.Y. 1989).

While the third party need not be expressly named as the intended beneficiary in the agreement, it is well-settled that the intent to benefit the third party must be shown on the face of the agreement. *See*, Newman & Schwartz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 662-63 (2d Cir. 1996) (law firm sufficiently stated a claim that it was third party beneficiary of an employment agreement wherein an employer agreed to pay an employee's legal fees; the promise to pay for legal services rendered to the employee was sufficient and it was not necessary that law firm providing those services be expressly named.)

Absent the showing of such an intent on the face of the agreement, "the third party is merely an incidental beneficiary with no right to enforce the contract." In re Gulf Oil, 725 F. Supp at 733; *see also*, Ahn v. Rooney, Pace Inc., 624 F. Supp. 368, 371 (S.D.N.Y. 1985) (to create an enforceable right, the parties must have intended to confer a benefit on the third party when contracting; it is not enough that some benefit incidental to the performance of the contract accrues to a third party); Artwear, Inc. v. Hughes, 202 A.D.2d 76, 81-82 (1st Dep't 1994) (plaintiff was, at best, an incidental beneficiary of a license agreement where there was no promise to render performance to a third party in plaintiff's position); Worldwide Sugar Co. v. Royal Bank of Canada, 609 F. Supp. 19, 25 (S.D.N.Y.

1984) (it is not enough that a contract operates to a third party's benefit; it must appear that the parties intended to recognize the third party as the primary party in interest and as privy to the promise).

Moreover, "[t]o create a third party right to enforce a contract, the language of the contract must clearly evidence an intent to permit enforcement by the third party." Consolidated Edison, Inc. v. Northeast Utilities, 426 F.3d 524, 528 (2d Cir. 2005) (quoting Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 66 N.Y. 2d 38, 45 (1985) (quotations and alterations omitted)); *see also*, Conklin v. City of Saratoga Springs, 267 A.D.2d 841, 842 (3d Dep't 1999) (breach of contract claim based on third party beneficiary status properly dismissed where contract did not reveal specific intent to confer a benefit upon plaintiff or permit him to enforce the contract terms) (citations omitted).

In this Court's view, there is nothing on the face of the DuPont-Nationwide rental agreement,[7] or in any of the communications preceding its execution, indicating that Nationwide: knew of DuPont's alleged obligation to provide steam to a third party, knew that a third party was operating a facility on DuPont's property, had knowledge of any third party's operational requirements, agreed to deliver equipment and services to anyone other than DuPont, agreed to assume responsibility for the day-to-day operation of the leased boilers, or agreed to assume responsibility for the delivery and distribution of steam on DuPont's property.

Similarly, it cannot be gleaned from the face of the agreement or any of the

---

[7] In reaching its conclusion, this Court considered the agreement standing alone and including Nationwide's GC-7 form in both its unamended form and with the handwritten notes appearing on the parties' respective exhibits.

preceding communications that DuPont intended for Nationwide to provide equipment and services directly to any third party or for Nationwide to assume any duty DuPont had to deliver particular quantities or pressures of steam to any end user.  In short, nothing in the rental agreement or the negotiations leading thereto indicates an intent that Nationwide's contractual obligations would give rise to any duty to a third party generally, or to Olin specifically.

Olin advances a number of arguments in support of its third party beneficiary claim that this Court finds unpersuasive.  First, Olin contends that the circumstances surrounding DuPont's Terathane shutdown are sufficient to create a question of fact as to whether Olin was a third party beneficiary under the rental agreement.  While courts applying New York law have recognized that they are not limited to the four corners of the agreement in considering the issue of third party beneficiary status, Olin's sole supporting citation does not suggest that "surrounding circumstances" alone give rise to such status, absent some indication in the actual agreement of the parties' intent.  In Barnum v. Millbrook Care Ltd. P'ship, 850 F. Supp. 1227, 1233 (S.D.N.Y. 1994), the Southern District noted that courts are permitted to consider surrounding circumstances, *in addition to the agreement*, when determining the existence of a third party beneficiary.  Id.  Barnum, who resided in a retirement community, was found to be a third party beneficiary to an agreement expressly providing for the refund of entrance fees to unnamed residents who met certain conditions. The surrounding circumstances and documentation confirmed that Barnum met the conditions set forth in the agreement.  *Id.* at 1233-34.  In short, the agreement clearly expressed the contracting parties' intent that performance be rendered to certain third

parties, and the circumstances identified the plaintiff as one of those intended beneficiaries.

In a similar vein, Olin argues that so long as circumstances demonstrate DuPont intended that Olin derive a benefit from the rental agreement, it is immaterial that the benefit to Olin is not evident on the face of the agreement and was not made known to Nationwide. Olin relies on several decisions that have found a promisee's intent to be of greater importance than the promisor's when determining whether a third party has enforcement rights. Based on this discrete phrasing, lifted out of all context, Olin urges that DuPont's secret intent to benefit Olin must at least raise a question of fact as to Olin's third party beneficiary status.

This Court is not persuaded by Olin's reasoning. None of its cited cases dispense with the requirement that the agreement itself contain some expression of intent that a benefit accrue to a third party or, at the very least, that the intent to benefit a third party be unmistakenly obvious to the promisor. While the cited cases recognize that an intent to benefit a third-party will seldom motivate a promisor, they do not suggest that a third party benefit is conferred absent the promisor's ultimate agreement to or understanding of such an intent. *See* New York State Energy Research and Dev. Auth. v. Nuclear Fuel Servs., Inc., 561 F. Supp. 954, 979 (W.D.N.Y. 1983) (*if a contract obviously confers a benefit directly upon a third person*,[8] the parties will be presumed to have intended the benefit, and

---

[8] In this case, the contract expressly named the third-party and provided that the third-party could request that the contracting parties perform certain tasks. The Court went on to distinguish between intended and incidental beneficiaries, the former being "those to whom performance will be directly rendered under the contract, as opposed to those who will merely receive some benefit in an incidental way, as a by-product of the agreement." *Id.*

9

to the extent their intent is relevant to the third party's right to enforce the contract, the promisee's intent is of greater importance); Goodman-Marks Assocs., Inc. v. Westbury Post Assocs., 70 A.D.2d 145, 146-(2d Dep't 1979) (where a *contract expressly provided* that two of the parties thereto would *pay directly to the plaintiff* a fee it was owed, plaintiff was clearly an intended beneficiary, consistent with the manifest intent of the promisee); Key Int'l Mfg. v. Morse/Diesel, Inc., 142 A.D.2d 448 (2d Dep't 1988) (question of fact existed as to whether land owner was third party beneficiary to contracts between its subsidiary development company and architectural and engineering firms providing design services, where promisors' performance "was *manifestly to be to the direct benefit of the owner* of the development" and it was "almost inconceivable that those professional engineers or architects who render their services in connection with a major construction project would not contemplate that the performance of their contractual obligations would ultimately benefit the owner"); Bradley v. Benchmark Mgmt. Corp., 294 A.D.2d 879, 879-80 (4th Dep't 2002) (property manager was not third party beneficiary to owner's contract for snow removal services where there was no evidence that owner intended that result or that snow removal company's contractual undertaking would give rise to a duty of care to third parties).

As this Court has already stated, there is no intent to benefit Olin evident on the face of the DuPont-Nationwide rental agreement.  Moreover, the nature and circumstances of the rental agreement do not suggest that it should have been glaringly obvious to Nationwide that a third party would directly benefit from its lease of boilers to DuPont. Finally, even assuming DuPont intended that Olin would receive some benefit as a result

10

of its agreement with Nationwide, there is no evidence that DuPont intended the rental agreement to give rise to any direct obligation or duty from Nationwide to Olin or that Nationwide assented to such a term.

This Court also rejects Olin's suggestion that DuPont and Nationwide never actually entered into a contract until the "last" alteration was agreed to. Olin argues that, because Nationwide learned, sometime between April 25, 2002 (rental agreement fully executed) and September 9, 2002 (second alteration signed by DuPont), that DuPont would be selling steam from the leased boilers to Olin, a question of fact exists as to whether Olin is a third party beneficiary.

Olin does not provide any authority in support of its novel view of contract formation. This Court notes that, as a practical matter, such an approach would leave most agreements indefinitely unfinalized and unenforceable. After all, prior to a contract's termination or expiration, how would one ever demonstrate that a particular amendment or alteration is, in fact, the "last" one such that a contract was finally formed.

In any event, Olin's theory, even if credited, is not sufficient to raise a question of fact sufficient to avoid summary judgment here. There is nothing on the face of either the first or second alteration suggesting an intent by either party to benefit Olin or to create a right of enforcement in Olin against Nationwide. Beyond that, there is no evidence of DuPont's intention, or Nationwide's agreement, that either of the alterations would give rise to any direct obligation or duty running from Nationwide to Olin.

## IV.  CONCLUSION

For the reasons stated, Defendant Nationwide Boiler, Inc.'s Motion for Summary Judgment seeking dismissal of the Amended Complaint is granted.

## ORDERS

IT HEREBY IS ORDERED, that Defendant Nationwide Boiler, Inc.'s Motion for Summary Judgment (Docket No. 39) is GRANTED and the Amended Complaint is dismissed in its entirety.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.

Dated:    February 21, 2007
         Buffalo, New York

                                         /s/William M. Skretny
                                         WILLIAM M. SKRETNY
                                         United States District Judge

12